## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**VERNESSIA ANDREWS,**

      **Plaintiff,**

**vs.**                                   **Case No. 5:11cv89-WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/

## MEMORANDUM OPINION

This is a social security case referred to me for ruling, upon consent of the parties, doc. 9, and an order of reassignment. Doc. 11.

**Procedural status of the case**

Plaintiff filed applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act on August 10, 2006. R. 151. Plaintiff alleged disability beginning on November 27, 2005, in both applications. R. 14. The applications were initially denied, and after a hearing held on February 10, 2009, the Administrative Law Judge found Plaintiff suffered from the following severe impairments: carpal tunnel syndrome, right wrist fracture with residual

hand dysfunction and tendonitis, and left eye disorder.  R. 16.[1]  The ALJ found that

although Plaintiff was incapable of performing her past relevant work, she could perform

other work (ticket taker, ticketer, and demonstrator) which existed in significant numbers

in the national economy and, therefore, was not disabled.  R. 17.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

---

[1] The ALJ noted other impairments which were non-severe: allergies and cancer.  R. 16-17.  Plaintiff has a history of cancer, but that is in remission and she is not currently undergoing treatment or limited by cancer.  Plaintiff presented no evidence of disabilities from her allergies.  *Id.*

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

      The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past relevant work?

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[2]

Plaintiff was born on June 5, 1956, and was 49 years of age on the alleged disability onset date, R. 21, but was 52 at the time of the hearing.  R. 28, 110, 133. Plaintiff lives with her husband and her mother-in-law, and provides limited care for her mother-in-law such as driving her "back and forth to her doctor's appointments."  R. 27. Plaintiff completed the eleventh grade and has no other vocational training.  R. 28. Plaintiff has past relevant work as a factory worker in the clothing industry, R. 29, and the last time she did that work was in 2004.  R. 30.  She was able to draw unemployment after the factory closed and she looked for work until she broke her arm. *Id.*

Plaintiff broke her arm on November 27, 2005, and ultimately had surgery three times for her wrist.[3]  R. 30-31.  Plaintiff said she has not experienced any improvement.

---

[2] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS' DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx, or PUBMED HEALTH, found at http://www.ncbi.nlm.nih.gov/pubmedhealth/, or EVERYDAYHEALTH, found at http://www.everydayhealth.com/drugs.  Information about medical terms and prescription drugs come from MEDLINE PLUS (MERRIAM-WEBSTER), found at: www.nlm.nih.gov/medlineplus/mplusdictionary.htm or NATIONAL INSTITUTES OF HEALTH, found at: http://health.nih.gov.  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.    The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

[3] Plaintiff fell on November 27, 2005, and landed on her wrist.  R. 174.  She had surgery on her wrist in May, 2006, in which a bone was removed from her hip and placed in her wrist.  *Id.*  She also had a plate inserted in her arm.  R. 174.  A year later, Plaintiff said the "place where the plate is she can feel and the bone they put in pops out of place."  R. 175.  Plaintiff said her fingers work, but her thumb and wrist bother her." *Id.*  She cannot turn her wrist sideways due to stiffness and swelling, and she said she can open doors but not jars.  *Id.*  She drives with her left hand which has now become her "good hand" although she is right handed.  *Id.*  She wears a brace all the time

R. 32.  She said she can "piddle around" the house with her right hand, "and try to keep

it clean a little bit and I get my husband to take the clothes to the laundry room for me

and, you know, use my left arm." *Id.*  Plaintiff is right-handed, but is able to "do a little

straightening up and pick up the clothes with [her] left hand and everything." *Id.*  Her

mother-in-law does most of the cooking. *Id.*  Plaintiff is able to drive a vehicle and uses

her left hand to do so because "it puts a strain on [her] right arm to try to hold that

steering wheel because right where the plate was in, the bone just aches all the time."

*Id.*  Plaintiff drives her mother-in-law to the grocery store and her mother-in-law picks

out what she wants and handles the shopping.[4]  R. 35-36.

Plaintiff said that she has pain when she tries to use her right hand and has "to

take some kind of pain tablets, like, Tylenol or BC and quit doing anything for a whole

day because it hurts so bad I can't even move it and it's stiff." R. 38.  Plaintiff said on an

average day, her pain is a seven on a scale of zero to ten, with ten being the worst

possible pain. *Id.*  It may sometimes go "up to eight." *Id.*  When her arm "gets to

hurting real bad," Plaintiff said that Dr. Williams has given her a prescription for

Darvocet, but Plaintiff said she does not have insurance to buy it.  R. 40-41.

Plaintiff also complained of eye pain and headaches.  R. 33, 39.  Plaintiff said

she has had headaches all her life.  R. 33.  When she gets a headache, she takes

---

except when in the shower. *Id.*  She can button and use zippers most of the time, but
has to use both hands. *Id.*

[4] In the October, 2006 report to Disability Determinations, Plaintiff reported that in "a
typical day she feeds animals, does household chores and watches her 82 year old
mother in law." R. 174.  She does some "quick cooking" and some laundry, but said her
mother in law did most of it. *Id.*  She does her own personal grooming and hygiene, her
own shopping, and gets to doctor's appointments fine.  R. 174.

between two and four "BC's" and has to go "lay down where it's dark, take a[n] ice pack and put it on my head and sleep until the next day or all night where there's no noise or nothing." R. 33. Plaintiff said she had surgery on her left eye when she was "about 11 years old and it was supposed to correct" the eye problem, but did not. R. 39. Plaintiff explained her eye problem was the source of her headaches and said, "My left eye where it went crossed when I was three years old and it pulled the strength out of my eyes by using it." R. 38-39.[5] She said that she still has "pain an[d] headaches real bad." R. 39. Because of her headaches, she had to miss work a lot, as much as three or four days a month. R. 34, 39-40. Plaintiff said her vision is okay in her right eye, but she has no vision in her left eye. R. 40. Nevertheless, she passed her driver's test and eye examinations and is able to drive safely. *Id.*

The ALJ took evidence from Charles Heartsill, a vocational expert, at the hearing. R. 42-49.[6] Mr. Heartsill concluded that Plaintiff could not perform her past work, R. 45, but could work as a ticketer, ticket taker, and demonstrator. R. 46-47. Mr. Heartsill also acknowledged that, hypothetically, if an individual experience distracting pain such that the individual was "not able to perform adequate work tasks," this "would preclude the capacity to continue work on a consistent, continuous basis." R. 48. This hypothetical was taken verbatim from a statement by Dr. Williams, Plaintiff's treating physician,

---

[5] A Report of Contact completed by Disability Determinations on October 16, 2006, states that Plaintiff "went cross eyed and had surgery when she was 12 and has headaches ever since." R. 174. This report also states that she drives, but "only uses her right eye." *Id.* The doctor told her "it would get worse as she aged and may go blind in her right eye because there is so much strain on it." *Id.*

[6] Although spelled as Hartsell in the transcript, R. 42-49, his resume reflects the correct spelling of this surname as Heartsill. R. 113.

which is the basis for the central issue in this case.  When first asked this hypothetical, Mr. Heartsill first asked whether Dr. Williams had clarified to what degree pain distracted from work.  *Id.*

**Medical Evidence**

Plaintiff's medical records from 1991 note that she had headaches and has had them since childhood, "before starting to school."  R. 220.  The diagnosis was that the "headaches do not appear eye related."  *Id.*   She reported reading was not a problem, but she said she had some blurriness.  R. 222.  She had had a nerve cut in her eye to straighten it.  *Id.*  The record indicated Plaintiff "has had migraines all her life" and then had them two to three times a week.  *Id.*  A neurological referral was recommended.  *Id.*

On November 27, 2005, Plaintiff fell and was seen in the emergency room of Doctors Memorial Hospital in Bonifay, Florida.  R. 226.   An x-ray of her right wrist revealed a "fracture on the distal radius at the metaphyseal level" with comminution.[7]  R. 228.  The carpal bones were maintained and the ulna appeared to be intact.  *Id.*  A splint and sling were applied and Plaintiff was told to contact Dr. Gilmore the next morning.  R. 227.  Toradol[8] was prescribed.  *Id.*

On January 25, 2006, Plaintiff was seen in the Department of Health for complaints of right arm pain.  R. 234.  She said that she tripped and fell about two months earlier and was told to contact the doctor's office.  *Id.*  Plaintiff said that she did

---

[7] A bone that has been splintered or crushed into numerous pieces is a comminuted fracture.  MEDLINE PLUS (MERRIAM-WEBSTER).

[8] Toradol is a nonsteroidal anti-inflammatory (NSAID) drug.  It is "indicated for short-term (up to 5 days in adults) management of moderately severe acute pain that requires analgesia at the opioid level.  It is NOT indicated for minor or chronic painful conditions."  PHYSICIANS' DESK REFERENCE (2004), p. 2966.

so, but "was unable to afford $1500 that they wanted up front when she called them so she decided to give it some time and see if it would get better on her own because to her knowledge it was not broken."  *Id.*  Plaintiff said she wore a splint on the wrist for a couple of weeks as instructed, but she is hoping to start a new job soon and was "having difficulty with ongoing pain and limited motion in that wrist, that is on the Rt. side."  *Id.*  After noting the problems with her wrist and reviewing the x-ray films Plaintiff brought with her (which showed overlapping carpal bones on the ulna side), Plaintiff was advised that her problem could not be fixed there.  *Id.*  She was instructed "to take her films w/ her and to go to the ER at Bay Medical center" to Bay Cares and explain she has no resources.  *Id.*  Plaintiff was advised that her wrist "needed to be repaired possibly by some one who was specialized."  *Id.*

The next day, January 26, 2006, Plaintiff was treated by Dr. Rafael Williams.  R. 484-485.  The examination revealed "obvious radial angulation to her wrist with no real obvious swelling."  R. 484.  Plaintiff had "some pain along the SL interval but is somewhat tender over the whole dorsum of the wrist."  *Id.*  "Flexion and extension of the wrist produce some pain."  *Id.*  Tinel's sign[9] produced some tingling in the fingers, but carpel compression and Phalen's test[10] were negative.  *Id.*  Plaintiff again brought the x-ray films with her which showed a "distal radius fracture without angulation or

---

[9] Tinel's test is performed by tapping the median nerve along its course in the wrist. A positive test is found when this causes worsening of the tingling in the fingers when the nerve is tapped.  See orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel_2.htm.

[10] Phalen's test is done by pushing the back of your hands together for one minute. This compresses the carpal tunnel and is also positive when it causes the same symptoms you have been experiencing with your carpal tunnel syndrome.  See orthopedics.about.com/cs/carpaltunnel/a/carpaltunnel_2.htm.

malalignment." *Id.*  New x-rays were taken that day and showed "the fracture site to be slightly impacted with the ulna being about 4-5 mm longer than the radius." *Id.*  There appeared to be "some callous formation but it is difficult to tell." *Id.*  The lateral view showed "a fairly well aligned wrist." *Id.*

Dr. Williams assessed Plaintiff with a "right wrist fracture malunion with mild carpel tunnel syndrome." R. 485.  The treatment plan was to have Plaintiff "continue working on motion of her wrist and to be less supportive on the brace." *Id.*  Plaintiff was given an "injection into the carpel canal and see how she response." *Id.*  The injection consisted of Dexamethasone[11] and Lidocaine.[12]  *Id.*  Plaintiff was to return in about five weeks for a follow-up, and if she was no better, Dr. Williams planned to obtain nerve conduction studies.  *Id.*  He also stated that if Plaintiff continued to have problems with her wrist, they "could consider corrective osteotomy of the distal radius or even ulnar shortening." *Id.*  His opinion was that it was "more likely that most of her pain at this time is being caused from stiffness." *Id.*

Plaintiff returned for her follow-up and more x-rays were taken on March 2, 2006. R. 486.  Plaintiff said the injection "did not provide her with much relief." R. 483.  She continued to have "problems with some numbness in the hand as well as some problems over the ulnar aspect of the wrist." *Id.*  Her examination showed "positive carpal compression and negative Tinel's." *Id.*  There was notable radial angulated deformity and tenderness "along the first dorsal compartment." *Id.*  The x-ray report

---

[11] Dexamethasone is a steroid that prevents the release of substances in the body that cause inflammation.  EVERYDAYHEALTH.

[12] Lidocaine is a local anesthetic (numbing medication).  It works by blocking nerve signals in your body.  EVERYDAYHEALTH.

indicated "she is about 3 mm ulnar minus on the left and about 1 cm minus on the right."

R. 486; 483.  "No doubt there has been collapse."  *Id.*  The x-rays did show

"Further evidence of healing."  *Id.*  On that same day, Dr. Williams filled out a "certificate

of medical necessity" form, R. 488, and a Surgical/Medical form for Vocational

Rehabilitation.  R. 482.

Dr. William's notes reflect that he discussed with Plaintiff that he thought "her

problem is somewhat two fold, one of which is related to some carpal tunnel, the other

of which is from her malunion."  R. 483.  Plaintiff had "mild symptoms of tendinitis as

well."  *Id.*  He believed the best course of action was "to do a corrective osteotomy with

bone grafting" and he also recommended "release of the median nerve as well as the

first dorsal compartment."  *Id.*  Plaintiff was to discuss this with Vocational Rehab., and

he explained she would need to be in a cast for 4-6 weeks, "and hopefully be able to

return to work within two months."  *Id.*

On May 19, 2006, Dr. Williams performed the first surgery on Plaintiff's right arm

at Bay Medical Center.  R. 348, 479.  The surgery consisted of three procedures: (1) an

open reduction and internal fixation, right distal radius malunion with volar locking plate

and left iliac crest bone graft; (2) right carpal tunnel release; and (3) release of right first

dorsal compartment.  R. 479-480.  There were no complications.  *Id.*

On May 23, 2006, x-rays were taken and showed "good alignment of the

osteotomy site with the plate."  R. 477.   Plaintiff was "doing well" and reported "mild

pain and burning at both incision[13] sites."  R. 478.  The incisions looked good, with no

---

[13] There was an incision in the wrist and at the hip where a bone was taken to
provide a bone graft in the wrist. R. 478-480.

signs of infection.  R. 478.  There was "some ecchymosis[14] and swelling as would be expected."  *Id.*  Plaintiff was placed in a cast which she would wear for about four weeks.  *Id.*

On May 31, 2006, Plaintiff returned for removal of sutures and staples.  R. 476. The wound had "healed up nicely" and there was some "slight swollen ecchymosis that would be expected."  *Id.*

Plaintiff returned for cast removal on June 21, 2006.  R. 474.  She said she had "some pain with extension, but it is questionable whether" that pain was "muscular related."  *Id.*  Plaintiff could "make a complete fist and her light touch is intact."  *Id.*  The wound healed up nicely, although Plaintiff had "numbness over" the area with "some tenderness."  *Id.*  X-rays taken that day showed "good alignment of the bones and it appears to be healing with some callus formation but it is difficult to tell."  R. 475. Plaintiff was to wear a wrist splint at all times except in the shower.  *Id.*

She returned on July 18, 2006, for follow-up and additional x-rays.  R. 473. Plaintiff was "stiff as might be expected and has some discomfort with extremes of motion."  *Id.*  Follow-up x-rays showed "good evidence of consolidation of the graft distally."  R. 472-473.  However, there was still "some evidence of a separation proximally."  *Id.*  Plaintiff was to continue wearing the wrist brace and do "gentle exercises to improve her motion."  R. 473.

By August, 2006, Plaintiff's motion was "50/50, extension/flexion" and her grip was "up significantly to 50 pounds."  R. 471.  She had "no pain with axial loading" but

---

[14] Ecchymosis is the escape of blood into the tissues from ruptured blood vessels marked by a livid black-and-blue or purple spot or area ; also : the discoloration so caused.   MEDLINE PLUS (MERRIAM-WEBSTER).

was still "somewhat tender over the first dorsal compartment."  *Id.*  X-rays from August 22, 2006, showed "some lucency at the proximal aspect of the osteotomy and bone grating site."  *Id.*  Dr. Williams wanted Plaintiff to have a CT scan "to try to evaluate for the presence of bridging bone."  *Id.*

The CT report indicated "a presence of a nonunion," but Dr. Williams thought he saw "some bridging callus in variable locations."  R. 470.  Dr. Williams found that Plaintiff "still has some pain with axial loading, but most of her pain seems to be along the radial aspect of the wrist."  *Id.*  Plaintiff also complained of some numbness.  *Id.*  On physical examination, "forced flexion creates some paresthesias[15] into the ring finger and small finger."  *Id.*  "Tinel's and carpal compression remain somewhat positive."  *Id.*  On September 12, 2006, Dr. Williams injected Plaintiff with mixture of .5 ml. Dexamethasone, .5 ml. 1% lidocaine injected in the right carpal canal without complication."  *Id.*  He also gave Plaintiff an extension brace to wear on her elbow, but decided to "hold off on doing any bone stimulator at" that time.  *Id.*

On October 26, 2006, Plaintiff returned complaining of increased pain in the last two weeks doing such things as cooking and raking her yard.  R. 468.  She said the pain "wakes her up at night and feels like a stabbing pain localized" in the right first dorsal compartment.  *Id.*  Plaintiff was given another pain injection and Dr. Williams gave her a thumb Spica splint.  R. 468.  He noted that Plaintiff appeared to have some returning inflammation along the first dorsal compartment.  *Id.*

---

[15] Paresthesia is a sensation of pricking, tingling, or creeping on the skin having no objective cause and usually associated with injury or irritation of a sensory nerve or nerve root.  MEDLINE PLUS (MERRIAM-WEBSTER).

Plaintiff returned on December 11, 2006, and said the injection helped her for only a short period of time.  R. 467.  On examination, Dr. Williams found Plaintiff had "pain along the area of the DRUJ and forceful pronation and supination and movement of the DRUJ causes somewhat of a click."  *Id.*  X-rays showed "complete healing now for really the first time" but there might "be some discordance at the DRUJ."  *Id.*  He gave Plaintiff another pain injection, but with an increased dose and adding Marcaine. *Id.*  Plaintiff was to come back in six weeks for a follow-up, and if no better, Dr. Williams would request "to do a re-release of her first wrist compartment as well as to do a wrist arthroscopy with evaluation of her inner carpal ligaments and TFCC."  *Id.*

In January, 2007, Plaintiff told a State agency employee that she did most of her activities with her left hand.  R. 189.  She said that without assistance she could drive, read mail, watch television, shop, load and unload groceries, do laundry, fold clothes, wash dishes, open doors, handle zippers, tie her shoes, wash her hair, feed pets, and pour from a gallon of milk.  *Id.*

On January 22, 2007, Plaintiff was evaluated again by Dr. Williams due to continued pain and the limited relief given by the injections.  R. 462.  She said the "injection helped temporarily but her pain unfortunately has recurred."  *Id.*  He recommended a wrist arthroscopy and a re-release of her first dorsal compartment.  *Id.*

This second surgery was performed on February 28, 2007.  R. 460.  There were no complications.  R. 461.  One week post-op, Plaintiff was "doing okay" overall, but she had "some pain along the dorsum of the thumb possibly due to swelling."  R. 459.  Dr. Williams said that Plaintiff's wounds had "healed up nicely."  *Id.*  Her sutures were

removed and Plaintiff was to "use the hand as tolerated and work on range of motion."
*Id.*

A Physical Residual Functional Capacity Assessment was completed by Dr.
Clarence Louis, a nonexamining physician, on March 5, 2007.  R. 372-379.  Dr. Louis
noted that the x-ray indicated "some callous formation" on the "well aligned wrist" and
showed there had been "complete healing of the wrist."  R. 373.  Plaintiff had "70
degrees extension and 40 degrees flexion with radial ulnar deviation 35 degrees."  *Id.*
Her grip was "5/5 bilaterally with pinch 13 bilaterally."  *Id.*  Exertional limitations were
noted as occasionally lifting 20 pounds, frequently lift 10 pounds, and unlimited pushing
or pulling.  *Id.*

Plaintiff had a followup appointment on April 19, 2007, which was seven weeks
post-op.  R. 458.  Plaintiff reported pain in her "right wrist noting difficulty with pinching
and gripping."  *Id.*  Plaintiff's grip was "60 compared to 65," her pinch was "14 compared
to 15" and she had "significant pain with the grind test and is very tender over the
CMC[16] joint."  *Id.*  Dr. Williams gave Plaintiff another pain injection and she was
provided with a thumb Spica splint."  *Id.*  Dr. Williams thought it was "possible that the
extensor tendons have some adhesions over the dorsum of the healed bone."  *Id.*
However, he did "not think that any of the screws [were] prominent but" it was possible
that they were bothering Plaintiff as well.  *Id.*  The plan was to see how Plaintiff did with
the injection, get the splint, and see her in six weeks.  *Id.*

---

[16]  The carpometacarpal joint (CMC) is the joint at the wrist and the base of the
thumb.  www.mayoclinic.com

On June 5, 2007, Plaintiff returned to Dr. Williams.  R. 457.  She was seen by Joey Eagerton, PA., with Dr. Williams present.[17]  *Id.*  She reported that the "injection helped temporarily."  R. 457.  Plaintiff had "still not gotten the CMC splint" so she was provided with one at that examination.  *Id.*  Plaintiff continued to have "pain along the CMC joint and also some pain along the DRUJ and possibly even the ECU tendon."  *Id.*  Plaintiff felt "some snapping at this area especially with such activities as picking up a frying pan along with the rotational part of the wrist."  *Id.*  Plaintiff also complained of numbness in the "right small finger which is becoming more bothersome and wakes her up at night."  *Id.*  Dr. Williams noted that wrist extension produced "some mild discomfort" and she was advised to wear the extension brace to sleep in at night.  *Id.*  Plaintiff was provided with another CMC splint and a Medrol dosepak[18] to help with the pain and irritation.  *Id.*  She would be seen again in six weeks and if no improvement, they would "talk about further workup."  *Id.*

Plaintiff was seen again on July 17, 2007.  R. 456.  She was seen by Joey Eagerton, PA., with Dr. Williams present.  *Id.*  She said the Medrol dosepak helped, but she "continues to have some pain and soreness in the right wrist."  R. 456.  "She notes that the pain is increased more the more she uses such as doing yard work."  *Id.*  She also reported that she continued to have numbness and tingling.  *Id.*  X-rays were taken and "show excellent healing of the distal radius."  *Id.*  From the x-rays, it did "not appear that the plate or the screws would be causing any problems."  *Id.*; R. 455.  There was

---

[17] This occurred several times.

[18] Medrol dosepak provides methylprednisolone, which is in a class of drugs called steroids.  Methylprednisolone prevents the release of substances in the body that cause inflammation.  EVERYDAYHEALTH.

concern, however, with Plaintiff's continued numbness and Eagerton "set her up for nerve conduction studies to evaluate the median and the ulnar nerve."  R. 456. Depending on the results of that study, further treatment options would be evaluated. *Id.*  PA Eagerton noted that it was "possible that the plate [was] causing her some pain and discomfort."  *Id.*  He said, "This can always be removed but it is hard to believe this would be the cause."  *Id.*

The EMG study of Plaintiff's right arm was performed on July 30, 2007.  R. 452. In all categories, the results were either "norm" (normal) or "none."  *Id.*  Both the nerve conduction study and an EMG of the right upper extremity were normal.  R. 449-451. There was "no evidence of radial neuropathy."  R. 450.  Dr. Jacob noted that Plaintiff had "a relatively weak grip on the right side however, the abduction, adduction of the finger and flexion of the fingers [was] normal."  R. 449.  He found no "wasting of the hand or forearm muscles."  *Id.*  Dr. Jacob also noted Plaintiff had a "sensory loss for pin prick, touch and vibration sensation below the elbow on the right side."  *Id.* Nevertheless, the "sensory impairment did not follow a peripheral nerve pattern or nerve root pattern."  *Id.*

On July 31, 2007, Dr. Williams completed a Clinical Assessment of Pain form.  R. 394.  He indicated that Plaintiff experienced pain "to such an extent as to be distracting to adequate performance of daily activities or work."  R. 394.  He further said that physical activity "greatly increased" Plaintiff's pain "and to such a degree as to cause distraction from tasks or total abandonment of task."  *Id.*  Dr. Williams felt that "the side effects of prescribed" medication would pose "some limitations" on Plaintiff's ability to

perform her work, "but not to such a degree as to create serious problems in most instances."  R. 394.

On August 1, 2007, Dr. Williams completed a Physical Capacities Evaluation form.  R. 395.  He indicated that in a normal workday, Plaintiff could frequently lift and carry one pound, and occasionally could lift and carry five pounds.  *Id.*  She said she could sit, stand, or walk eight hours a day, and did not need an assistive device to ambulate.  *Id.*  He said that Plaintiff rarely could perform gross manipulation (grasping, twisting, or handling), could occasionally push or pull with arms or legs, climb stairs, do fine manipulation, operate motor vehicles, or work around hazardous machinery, and could frequently bend, stoop or reach overhead and had no environmental limitations. *Id.*  He did not think that Plaintiff would miss any days of work due to her impairment. *Id.*  He wrote that Plaintiff had pain with grasping and (what appears to be) "general extension" of her hand and wrist.  *Id.*

Plaintiff returned to Dr. Williams on August 14, 2007, for a recheck following the nerve conduction studies.  R. 445.  She continued to complain of numbness, but Dr. Williams noted the "nerve studies came back notably negative for carpal tunnel and also ulnar neuropathy but she does continue to have symptoms."  *Id.*  Dr. Williams determined that because conservative treatment had failed, "the only other option is surgical debridement of the FCR tendon sheath and also release of the ulnar nerve."  *Id.* He said the plate could be removed from the distal radius also as that could be causing Plaintiff "some discomfort as well."  *Id.*

On September 12, 2007, Dr. Williams performed the third surgery on Plaintiff's right arm.  R. 443-444.  This procedure included a right flexor carpi radialis

debridement, hardware removal, and debridement and release of the ulnar nerve of the right wrist.  *Id.*  There were no complications and the operation was deemed to have been successful.  R. 444.

Plaintiff had a post-op examination on September 19, 2007, and her wounds were "doing well."  R. 442.  Her sutures were removed, and the records reflect Plaintiff's "numbness has already improved in the hand."  *Id.*

On October 22, 2007, Plaintiff reported that the "continues to have some discomfort and burning along the scar with limited range of motion."  R. 441.  Her range of motion was "somewhat limited with about 30 degrees of extension and 45 degrees of flexion."  *Id.*  Her grip was "35 right compared to 65 left."  *Id.*  Dr. Williams thought that the "burning sensation she is feeling is the scar pain and this may be a lot of her discomfort as well."  *Id.*  He explained that the stiffness was "common as well as the scar pain."  *Id.*  He thought that Plaintiff might not be "working aggressively on her range of motion because it hurts."  *Id.*  He provided Plaintiff with samples of a topical scar cream which could help with the sensation and thought Plaintiff would benefit from "some physical therapy to help desensitize the scar and also help improve her range of motion and strength."  *Id.*  He noted Plaintiff was getting discouraged, but thought they could "work through this and hopefully she will be a lot better within the new few weeks." *Id.*

Plaintiff had one month of physical therapy, from October 31, 2007, through November 30, 2007.  R. 419.  She was released from therapy in December to an exercise program, noting she had reach her "maximum rehabilitation potential."  *Id.*  The

discharge summary from Family Physical Therapy noted Plaintiff was "moderately improved."  *Id.*

Plaintiff's next examination was on December 4, 2007, "two and a half months status post hardware removal with debridement of tendons and nerve release in the right wrist."  R. 440.  Dr. Williams noted that "[o]verall, she seems to be doing better." *Id.*  He noted that Plaintiff's "grip has gone up and was last measured at 42 pounds by the therapist."  *Id.*  Plaintiff's motion was also "up to 50/65."  *Id.*  Plaintiff complained that she "still gets some cramping," but Dr. Williams explained that was normal.  *Id.*  She also had "some mild scar pain, which is also normal."  *Id.*  He advised Plaintiff to "continue to work on scar massage and continue to work on strengthening the hand." *Id.*  Plaintiff noted some "mild numbness going down the arm when she bends it or when she lays on it."  *Id.*  Dr. Williams said he would try to get Plaintiff another "extension brace to sleep in and hopefully" it would help her.  *Id.*

On April 22, 2008, Plaintiff returned to Dr. Williams complaining of "pain in the right wrist area."  R. 490.  The notes indicate Plaintiff had "pain along the right first dorsal compartment" and had tenderness in that area.  *Id.*  "She does have a positive Tinel's over the superficial radial nerve, which radiates into the dorsum of her thumb." *Id.*  Dr. Williams thought there was "some scarring around the superficial radial nerve and that" was why she was getting the tingling sensation.  *Id.*  He provided her with trial samples of Celebrex[19] and directed her not to take ibuprofen or Motrin with the Celebrex.  *Id.*  She said ibuprofen and Motrin had not provided her with relief.  *Id.*  She

---

[19] Celebrex (generic name, Celecoxib) is in a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs).  Celecoxib works by reducing hormones that cause inflammation and pain in the body.  EVERYDAYHEALTH.

was to return in "about two months time and if she still has not had much relief we will

possibly recommend injection of the first dorsal compartment and around the superficial

radial nerve." *Id.* The notes also indicated that Plaintiff had been given "a Medrol dose

pack back in January, which seemed to help with the hip pain." *Id.*

**Legal analysis**

Plaintiff contends that the ALJ did not properly evaluate the medical opinions by

Dr. Williams, Plaintiff's treating physician. Doc. 15, p. 4. Plaintiff notes that Dr. Williams

"expressed medical opinions concerning the functional restrictions caused by [Plaintiff's]

medically determinable physical and psychological impairments." *Id.* Plaintiff asserts

that Dr. Williams clinical assessment of pain indicated that Plaintiff "experienced pain to

such an extent as to be distracting to adequate performance of daily activities or work,

and that physical activity would lead to greatly increased pain and to such a degree as

to cause distraction from tasks or total abandonment of task." Doc. 15, p. 5, *citing* R.

394. Plaintiff argues that the Vocational Expert opined that if the limitations expressed

in Dr. Williams's opinion were true, they would preclude work. Doc. 15, p. 5, *citing* R.

48.

The ALJ discounted the opinion of Dr. Williams. The ALJ said that Dr. Williams

had "noted that pain was present to such an extent as to be distracting to adequate

performance of daily activities and work tasks, *but not to a serious degree.*" R. 19. She

reasoned:

> Some weight is given to Dr. William[s]'s opinion regarding claimant's
> residual functional capacity. However, because claimant has failed to
> demonstrate the complete inability to use her right arm and is able to use
> it to assist her, I restrict the claimant to lifting and carrying only 5 pounds

with her right arm only.[20]  Little weight is given to Dr. Williams's mental functioning opinion where he opined that claimant's pain was distracting enough to interfere with her activities of daily living, because Dr. Williams is not a mental health professional and has not given the claimant any regularly pain medications.

R. 20.

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Winschel v. Commissioner of Social Sec., 631 F.3d 1176, 1179 (11th Cir. 2011).  This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th

---

[20] The ALJ had determined that Plaintiff could occasionally lift and carry up to 5 pounds and frequently lift and carry up to 1 pound with the right hand.  R. 17.

Cir. 2004).  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

Discounting the opinion of Dr. Williams because he was not a mental health professional is contrary to established law.  Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain.  One begins with the familiar way that subjective complaints of pain are to be evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  This is guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.  Who else is better able to determine the existence of an underlying medical condition that can reasonably be expected to give rise to the claimed pain than the treating physician?  That is why it is so well-established that the treating physician's opinion as to the existence and effects of pain must be given substantial weight.  *See, e.g.*, Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991) (finding that the opinion of the treating physician that the claimant suffers from disabling pain must be accepted as true).

The second reason for discounting Dr. Williams's opinion, however, is an adequate reason and is supported by substantial evidence in the record. Both before after the first and second surgeries, Dr. Williams provided five injections for the temporary relief of pain. R. 485, 470, 468, 467, 458. These only consisted of a numbing agent (Lidocaine) and a steroid (Dexamethasone). On June 5, 2007, after the second surgery, Dr. Williams provided a Medrol dosepak, another steroid. R. 457. The last notation, on April 22, 2008, after the third surgery, when ibuprofen and Tylenol did not provide relief, Dr. Williams prescribed Celebrex, another nonsteroidal anti-inflammatory drug. R. 490. During this more than a year of treatment, Dr. Williams did not prescribe any regular narcotic pain medication. That the claimant does not use potent pain medications is a factor that may be considered by the ALJ in determining whether to give full credit to pain testimony. Harwell v. Heckler, 735 F.2d 1292, 1293 (11th Cir. 1984); Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (that the claimant was routinely given only aspirin, Motrin, Tylenol, and Darvocet for pain was substantial evidence that she suffered only mild to moderate pain); Wilson v. Barnhart, 284 F.3d 1219, 1226 (11th Cir. 2002) (limited use of pain medication was substantial evidence to discount a claimant's pain testimony).

The third reason for discounting Dr. Williams's opinion, that Plaintiff had failed to demonstrate complete inability to use her right arm, and to find instead that she could occasionally lift and carry up to 5 pounds and frequently lift and carry up to 1 pound with her right arm, is likewise supported by substantial evidence in the record.

To begin with, that is essentially what Dr. Williams said on August 1, 2007, when he completed a Physical Capacities Evaluation form. R. 395. Dr. Williams indicated

that in a normal workday, Plaintiff can frequently lift and carry one pound, occasionally lift and carry five pounds, sit, stand, or walk eight hours a day, does not need an assistive device to walk, and will not miss any work days due to her impairment.  *Id.*

Further, the ALJ thoroughly discussed the medical evidence.  The ALJ noted that although Dr. Williams had found on December 28, 2006, only one month after surgery, that Plaintiff had limited range of motion of her right wrist, on November 2, 2006, he had found that she had only "some decreased right arm dexterity, and her grip strength in her right hand was also 4 out of 5."  R. 18.  The ALJ then commented that Plaintiff's "medical records show normal hand strength and function or 4 out of 5 strength and functioning, but the records do not reflect an inability to use the right hand or the level of dysfunction as described by the claimant's testimony."  R. 19.  She also noted that on March 5, 2007, Dr. Louis determined that Plaintiff's wrist had completely healed.  *Id.*  The ALJ noted that Plaintiff was able to perform activities of daily living.  *Id.*  The ALJ noted that the EMG and NCV studies were normal, and there was no evidence of neuropathy.  *Id.*  The ALJ noted that after the third surgery, Dr. Williams found that Plaintiff was doing better, her right wrist was healing properly, and she had "good functioning, some cramping within normal limits, and mild scar pain."  R. 20.

All of this is supported by substantial evidence in the record.  Following the first surgery on May 19, 2006, x-rays showed "good alignment" of the bones and Plaintiff was healing nicely.  The records reflected that Plaintiff was "doing well" and reported just "mild pain and burning" at the incision sites.  Plaintiff could "make a complete fist and her light touch is intact."  By August, 2006, Plaintiff's motion was "50/50, extension/flexion" and her grip was "up significantly to 50 pounds."  She had "no pain

with axial loading" but was still "somewhat tender over the first dorsal compartment."
Plaintiff had a CT scan "to try to evaluate for the presence of bridging bone."  The CT
report indicated "a presence of a nonunion" but Dr. Williams thought he saw "some
bridging callus in variable locations."  Plaintiff complained of numbness and "still has
some pain with axial loading, but most of her pain seems to be along the radial aspect
of the wrist."  Plaintiff complained of increased pain, but she also reported doing such
things as cooking and raking her yard.  She was provided pain injections which only
provided temporary relief.

While x-rays showed "complete healing," Plaintiff continued to report pain and
another surgery was scheduled for February, 2007.  Yet in January, 2007, Plaintiff told a
State agency employee that she could drive, shop, load and unload groceries, do
laundry, fold clothes, wash dishes, open doors, and handle zippers.  Plaintiff also
reported being able to tie her own shoes, feed pets, pour from a gallon of milk, and
wash her own hair.  These activities are consistent with an ability to use her right arm
and hand for many purposes.

The second surgery was performed February 28, 2007, and after initially "doing
okay," within seven weeks post-op, Plaintiff reported pain in her right wrist and said she
had "difficulty with pinching and gripping."  Plaintiff's grip was "60 compared to 65," her
pinch was "14 compared to 15" and she had "significant pain with the grind test and is
very tender over the CMC joint."  Plaintiff had another pain injection and was provided a
thumb Spica splint and later, a Medrol dose pack to help with pain and irritation. She
said the Medrol dose pack helped, but she continued to have some pain and soreness.
However, Plaintiff reported the pain increased the more she did such things as "yard

work." *Id.*  Although x-rays showed "excellent healing of the distal radius," and it did "not appear that the plate or the screws would be causing any problems," Dr. Williams was concerned with Plaintiff's continued numbness.

Both the nerve conduction study and an EMG performed on July 30, 2007, were normal.  There was "no evidence of radial neuropathy," and no "wasting of the hand or forearm muscles."  While Plaintiff had a "sensory loss for pin prick, touch and vibration sensation below the elbow on the right side," the "sensory impairment did not follow a peripheral nerve pattern or nerve root pattern."

Dr. Williams completed the Clinical Assessment of Pain form in August, 2007. Plaintiff had a third surgery perform by Dr. Williams on September 12, 2007, due to complaints of numbness and some discomfort from the plate.  She benefitted from physical therapy and use of a topical scar cream after surgery.  When Plaintiff was released from therapy in December, 2007, she had reached her "maximum rehabilitation potential" and the therapy notes reported Plaintiff was "moderately improved."  Plaintiff's grip strength had increased and her range of motion was also "up to 50/65." *Id.*  Plaintiff had only normal "mild scar pain" and Plaintiff was directed to "continue to work on scar massage and continue to work on strengthening the hand."

When Plaintiff returned to Dr. Williams on April 22, 2008, complaining of pain, she was only provided samples of Celebrex.

In summary, the ALJ did not err in the way she resolved the conflicts in the opinions of Dr. Williams.  She  accounted for Plaintiff's right hand limitations and her experience of right hand pain by finding that Plaintiff can only occasionally push and pull with her right upper extremity, may only occasionally perform handling and fingering

tasks with the right hand, and can use the right hand as a helper for left hand tasks.  R.

45.  As the vocational expert testified, these limitations do not preclude work as a

ticketer, ticket taker, or demonstrator.  R. 46.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge

were based upon substantial evidence in the record and correctly followed the law.

Accordingly, it is **ORDERED** that the decision of the Commissioner to deny

Plaintiff's application for Social Security benefits is **AFFIRMED** and the Clerk is

**DIRECTED** to enter judgment for Defendant.

**DONE AND ORDERED** on November 15, 2011.


**S/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**